**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

VAHAN A. SETYAN, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

PROSHARES TRUST; PROSHARES ADVISORS LLC; SEI INVESTMENTS DISTRIBUTION CO.; MICHAEL L. SAPIR; LOUIS M. MAYBERG; RUSSEL S. REYNOLDS, III; MICHAEL WACHS; and SIMON D. COLLIER

Defendants.

**Civil No.:**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**




Plaintiff, Vahan A. Setyan, individually and on behalf of all others similarly situated, by his attorneys, alleges the following upon information and belief, except for those allegations as to himself, which are alleged upon personal knowledge. The allegations are based on counsel's investigation, documents filed with the United Sates Government and Securities and Exchange Commission (the "SEC"), and reports published in the press.

**NATURE OF THE ACTION**

1. This is a class action on behalf of all persons who purchased or otherwise acquired share in the ProShares UltraShort S&P500 Fund (the "SDS Fund"), an exchange traded fund ("ETF") offered by Defendant ProShares Trust ("ProShares" or the "Trust"), pursuant or traceable to ProShares' false and misleading Registration Statement, Prospectuses, and/or Statements of Additional Information (collectively, the "Registration Statement") issued in

connection with the SDS Fund's shares (the "Class"). Plaintiff is seeking to pursue remedies under Section 11 and 15 of the Securities Act of 1933 (the "Securities Act").

2. ProShares consists of a portfolio of 90 ETFs, including the SDS Fund. ETFs, regulated by the SEC under the Investment Company Act of 1940 (the "1940 Act"), are funds that track a particular stock index. After being issued, shares in the ETFs are bought and sold on secondary exchanges, or aftermarkets, such as in the New York Stock Exchange.

3. Non-traditional, or so-called "leveraged" and/or "inverse" ETFs, such as the SDS Fund, have attracted increasingly significant investor assets.

4. ProShares manages approximately 99 percent of the country's short and leveraged ETFs; overall, it is the fifth largest provider of ETFs in the United States. ProShares designs each of its ETFs to correspond to the performance of a daily benchmark -- such as the price performance, the inverse of the price performance, or a multiple of the inverse of the price performance -- of an index or security.

5. ProShares' ETFs are essentially divided into two categories: Ultra and UltraShort.

6. ProShares sells its Ultra and UltraShort ETFs as "simple" directional plays. As marketed by ProShares, Ultra ETFs are designated to go up when markets go up; UltraShort ETFs are designed to go up when markets go down.

7. The SDS Fund is one of ProShares' UltraShort ETFs.

8. The SDS Fund seeks twice (200%) the inverse (opposite) of the daily performance of the S&P 500 Index. The SDS Fund is mandated to take positions in securities and/or financial instruments that, in combination, before fees and expenses, should have similar daily return characteristics at +200% of the inverse of the daily return of the S&P 500 Index.

9. ProShares describes its strategy as "simple" to execute. Defendant ProShare Advisors LLC ("ProShare Advisors" or the "Advisor"), which serves as the investment advisor

to the SDS Fund, purports to use a straightforward mathematical approach to investing. Indeed, ProShares attributes its rapid growth to the "simplicity" its ETFs bring to implementing sophisticated investment strategies. ProShares states that ProShare Advisors "determines the type, quantity and mix of investment positions that a[n ETF] should hold to simulate the performance of its daily benchmark," as opposed to advising ProShares to invest assets in stocks or financial instruments based on ProShare Advisors' view of the investment merit of a particular security, instrument, or company.

10. The Registration Statement misled investors that the SDS Fund would deliver double the inverse of the return of the S&P 500 Index.

11. For the year 2009 until July 31, 2009, the S&P 500 Index increased approximately six percent. Rather than decreasing only approximately twelve percent, the SDS Fund fell approximately 29 percent.

12. ProShares does not market the SDS Fund or its other ETFs as day-trading vehicles. ProShares' Chairman has publicly stated that investors can use ProShares' ETFs "for more than a day successfully." ProShares' imposes no temporal limits on investors in its UltraShort ETFs.

13. ProShares' Registration Statement provides hypothetical example of fees that investors may encounter over 1-year, 3-year, 5-year, and 10-year periods, thereby misleading investors that the SDS Fund may be used for intermediate or long-term investing.

14. The Registration Statement did not explain that, notwithstanding the investment objective of the SDS Fund, and the purpose of ProShares' Ultra ETFs, the SDS Fund would -- to a mathematical certainty -- cause enormous losses versus its stated goal if used for long-term investing. The enormous losses are accelerated when the market becomes more volatile.

15. On June 11, 2009, the Financial Industry Regulatory Authority ("FINRA") issued Regulatory Notice 09-31 (the "FINRA Notice"). The FINRA Notice cautioned that "inverse and leveraged ETFs . . . typically are unsuitable for retail investors who plan to hold them for longer than one trading session, particularly in volatile markets." FINRA reminded those who deal in non-traditional ETFs that sales materials related to leveraged and inverse ETFs "must be fair and accurate." Thereafter, FINRA spokesman Herb Perone stated: "Exotic ETFs, such as inverse, leveraged and inverse-leveraged ETFs, are extremely complicated and confusing products . . ." FINRA issued additional warnings on July 13, 2009, by way of a podcast on its website.

16. On June 11, 2009, the Financial Industry Regulatory Authority ("FINRA") issued Regulatory Notice 09-31 (the "FINRA Notice"). The FINRA Notice cautioned that "inverse and leveraged ETFs . . . typically are unsuitable for retail investors who plan to hold them for longer than one trading session, particularly in volatile markets." FINRA reminded those who deal in non-traditional ETFs that sales materials related to leveraged and inverse ETFs "must be fair and accurate." Thereafter, FINRA spokesman Herb Perone stated: "Exotic ETFs, such as inverse, leveraged and inverse-leveraged ETFs, are extremely complicated and confusing products . . ." FINRA issued additional warnings on July 13, 2009, by way of a podcast on its website.

17. Since FINRA's warnings, many financial companies, including Edward Jones & Co., UBS, Ameriprise Financial, LPL Investment Holdings Inc., Wells Fargo, Morgan Stanley Smith Barney, and Charles Schwab have either halted, or provided strongly worded warnings concerning, leveraged and/or inverse ETF trading.

18. In a July 31, 2009 prospectus, ProShares stated a leveraged fund "seeks investment results **for a single day only**" and leveraged funds "**do not seek to achieve their stated investment objective over a period of time greater than one day**." (Emphasis in original in both examples). These statements were still misleading because, among other things,

they omitted that shares in the ETFs should only be used as short-term trading vehicles. Nonetheless, these statements, and the fact that they were now in bold, demonstrate that the earlier statements of "risk" were misleading.

19. On August 18, 2009, the SEC issued an alert that began by stating: "The SEC staff and FINRA are issuing this Alert because we believe individual investors may be confused about the performance objectives of leveraged and inverse exchange-traded funds (ETFs). Leveraged and inverse ETFs typically are designed to achieve their stated performance objectives on a daily basis. Some investors might invest in these ETFs with the expectation that the ETFs may meet their stated daily performance objectives over the long term as well. Investors should be aware that performance of these ETFs over a period longer than one day can differ significantly from their stated daily performance objectives."

20. The SEC alert also stated: "Most leveraged and inverse ETFs 'reset' daily, meaning that they are designed to achieve their stated objectives on a daily basis. Their performance over longer period of time—over weeks or months or years— can differ significantly from the performance (or inverse of the performance) of their underlying index or benchmark during the same period of time. This effect can be magnified in volatile markets."

21. The SEC alert provided "two real-life examples" to "illustrate how returns on a leveraged or inverse ETF over longer periods can differ significantly form the performance (or inverse of the performance) of their underlying index or benchmark during the same period of time.

22. The SEC alert states: "While there may be trading and hedging strategies that justify holding these investments longer than a day, buy-and-hold investors with an intermediate or long-term horizon should carefully consider whether these ETFs are appropriate for their portfolio. As discussed above, because leveraged and inverse ETFs reset each day, their

performance can quickly diverge from the performance of the underlying index or benchmark. In other words, it is possible that you could suffer significant losses even if the long-term performance of the Index showed again."

23. As a result of ProShares' misleading Registration Statement, Plaintiff and the Class have suffered losses.

**JURISDICTION AND VENUE**

24. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act [15 U.S.C. §§ 77k and 77o].

25. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act.

26. Venue is proper in the District pursuant to 28 U.S.C. § 1391(b), because many of the acts and practices complained of herein occurred in substantial part in this District, and the shares of the SDS Fund trade in this District on the New York Stock Exchange ("NYSE") Arca.

27. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

28. Plaintiff Vahan A. Setyan purchased shares of SDS Fund pursuant to or traceable to the Registration Statement, and suffered harm thereby.

29. Defendant ProShares, located at 7501 Wisconsin Avenue, Suite 1000, Bethesda, Maryland 20814, is a Delaware statutory trust organized on Mary 29, 2002.

30. ProShares is registered with the SEC as an open-management investment company under the 1940 Act. ProShares has a portfolio of ETFs, the shares of which are all

currently listed on the NYSE Arca. Each ProShares ETF has its own CUSIP number and exchange trading symbol. Each ProShares ETF issues and redeems shares on continuous basis at net asset value ("NAV") in large, specified numbers of shares called "Creation Units." A Creation Unit is typically comprised of 50,000 or 75,000 shares. ProShares now manages over $20 billion, accounting for 99 percent of the country's short and leveraged ETFs.

31. Defendant ProShares Advisors, located at 7501 Wisconsin Avenue, Suite 1000, Bethesda, Maryland 20814, serves as the investment advisor to the SDS Fund. ProShares Advisors provides investment advice and management services to ProShares and its ETFs, including the SDS Fund. ProShare Advisors oversees the investment and reinvestment of the assets in SDS Fund.

32. ProShares Advisors is owned by Defendant Michael L. Sapir ("Sapir"), Defendant Louis M. Mayberg ("Mayberg") and William E. Seale.

33. Defendants SEI Investments Distribution Co. ("SEI"), located at 1 Freedom Valley Drive, Oaks, Pennsylvania, 19456, is the distributor and principal and underwriter for the SDS Fund. SEI has been registered with the SEC and FINRA since 1982. SEI was hired by ProShares to distribute shares of the SDS Fund to broker/dealers and, ultimately, shareholders.

34. Defendant Sapir, an interested trustee ProShares, has been the Chairman and Chief Executive Officer of ProShares Advisors since its inception. Sapir signed the Registration Statement.

35. Defendant Mayberg has been President of ProShare Advisors since inception. Mayberg signed the Registration Statement.

36. Defendant Russell S. Reynolds, III ("Reynolds') is a non-interested trustee of ProShares who signed the Registration Statement.

37. Defendant Michael Wachs ("Wachs") is a non-interested trustee of ProShares who signed the Registration Statement.

38. Defendant Simon D. Collier ("Collier") was ProShares' Treasurer From June 2006 through November 2008. In his capacity as Treasurer, Collier signed the Registration Statement.

39. The individual Defendants referenced in paragraphs 34 through 38 are referred to as the "Individual Defendants."

The Individual Defendants, in their respective roles, controlled the operations of the SDS Fund. The Board of Trustees of ProShares is responsible for the general supervision of all of the SDS Fund. The officers of ProShares are responsible for the day-to-day operations of the SDS Fund.

**CLASS ACTION ALLEGATIONS**

40. Plaintiff brings this action as class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired shares of the SDS Fund pursuant or traceable to the Trust's false and misleading Registration Statement and were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Trust, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

41. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believe that there are thousands of members in the proposed Class.

42. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants wrongful conduct in violation of federal law that is complained of herein.

43. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experience in class and securities litigation.

44. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.

45. Among the questions of law and fact common and the Class are:

(a) whether the Securities Act was violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public in the Registration Statement misrepresented material facts about the business and/or ProShares; and

(c) to what extent the members of the Class have sustained damages and the proper measures of damages.

46. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

47. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it possible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## BACKGROUND

**Traditional ETFs**

48. ETFs are open-ended, with a unique creation and redemption feature that provides for the creation of large blocks of ETF shares only by authorized participant, which are usually institutional investors, specialists or market maker, who signed a participant agreement with a

particular ETF sponsor or distributor to satisfy investor demand and provide market liquidity. ETFs are frequently considered low cost index mutual funds that trade like stocks. ETFs, however, differ from traditional mutual funds in the following ways:

(a) ETFs do not sell individual shares directly to investors and only issue shares in large blocks (75,000 shares, for example) that are known as "Creation Units";

(b) Investors generally do not purchase Creation Unites with cash. Instead, investors buy Creation Units with a basket of securities that generally mirror an ETF portfolio;

(c) After purchasing a Creation Unit, an investor often splits it up and sells the individual shares on secondary market. This permits other investors to purchase individual shares (instead of Creation Units); and

(d) Investors who want to sell their ETF shares have two options: (1) they can sell individual shares to other investors on the secondary market, or (2) they can sell the Creation Units back to the ETF. ETFs generally redeem Creation Units by giving investors the securities that compromise the portfolio instead of cash.

49. In 1993, the American Stock Exchange launched the first traditional ETF, called the Spiders (or SPDR), which tracked the S&P 500. Soon after, more ETFs were introduced to the market, for example the Diamonds ETF in 1998, which tracked the Dow Jones Industrial Average, and the Cubes in 1999, which tracked the NASDAQ 100.

**Non-Traditional/Leveraged ETFs**

50. Non-traditional, or leveraged ETFs, such as the SDS Fund, are a new form of ETFs that seek to deliver multiples of the performance of the index or benchmark they track. Most leveraged ETFs "reset" daily.

## SUBSTANTIVE ALLEGATIONS

### A. The SDS Fund

51. The Registration Statement stated that the SDS Fund seeks daily investment results, , before fees and expenses, that correspond to twice (200%) the inverse (opposite) of the daily performance of the S&P 500 Index.

52. For the year 2009 until July 31, 2009, the S&P 500 Index increased approximately six percent. Rather than decreasing only approximately twelve percent, the SDS Fund fell approximately 29 percent.

53. The Registration Statement omitted that holding shares of the SDS Fund for any period more than a day will -- to a mathematical certainty -- not track the market. Indeed, holding shares over a long-period to time will lead to enormous losses to a mathematical certainty.

54. Class members did not view ETFs as day trading investment vehicles and did not day trade the SDS Fund. In fact, it is virtually economically impossible for all SDS Fund purchasers to sell out of their positions at the end of one day.

### B. The False and Misleading Registration Statement

55. On or about January 30, 2007, ProShares filed the Registration Statement, which was continually updated. The January 30, 2007 prospectus was signed by the Individual Defendants.

56. A later prospectus, filed on September 30, 2008, stated, in pertinent part:

> **Investment Objective**
>
> ProShares UltraShort S&P500 seeks daily investment results, before fees and expenses, that correspond to twice (200%) the inverse (opposite) of the daily performance of the S&P 500 Index.
>
> If ProShares UltraShort S&P500 is successful in meeting its objective, its net asset value should gain approximately twice as much, on a percentage basis,

before fees and expenses, as any decrease in the S&P 500 Index when the Index declines on any given day. Conversely, its net asset value should lose approximately twice as much, on a percentage basis, before fees and expenses, as any increase in the Index when the Index rises on a given day.

**Principal Investment Strategies**

ProShares UltraShort S&P500's principal investment strategies include:

- Taking positions in financial instruments (including derivatives) that ProShare Advisors believes, in combination, should have similar daily return characteristics as twice (200%) the inverse performance of the S&P 500 Index. Information about the Index can be found in the section entitled "Underlying Indexes."
- Committing at least 80% of its net assets, including any borrowings for investment purposes, to investments that, in combination, have economic characteristics that are inverse to those of the Index.
- Employing leveraged investment techniques in seeking its investment objective.
- Investing assets not invested in financial instruments in debt instruments and/or money market instruments.
- The Fund will concentrate its investments in a particular industry or group of industries to approximately the same extent as the Index is so concentrated.

57. The September 30, 2008 prospectus discussed a laundry list of risks, but left out a clear discussion of the most crucial one – how investing in the SDS Fund for more than one day would inevitably lead to swift and radical losses:

**Principal Risks**

ProShares UltraShort S&P500 is subject to the following principal risks:

- Aggressive Investment Technique Risk, Correlation Risk, Counterparty Risk, Credit Risk, Early Close/Trading Halt Risk, Equity Risk, Inverse Correlation Risk, Investment Company and Exchange Traded Fund Risk, Liquidity Risk, Market Price Variance Risk, Market Risk, Non-Diversification Risk, Portfolio Turnover Risk and Short Sale Risk.

58. The statements in paragraphs 56 and 57 were false and/or misleading because they failed to disclose:

- Performance of the SDS Fund would inevitably diverge from the performance of the S&P 500 Index —i.e., the overwhelming probability, if not certainty, of spectacular tracking error;
- The SDS Fund's stated daily performance objectives could not be achieved in the intermediate or long term;
- The severe consequences of market volatility on the SDS Fund's investment objective and performance; and
- The severe consequences of inherent path dependency in periods of market volatility of the SDS Fund's performance.

59. As discussed above, ProShares changed – but did not cure – the presentation of its statements. On July 31, 2009, ProShares stated that a leveraged fund "seeks investment results **for a single day only"** and leveraged funds **"do not seek to achieve their stated investment objective over a period of time greater than one day."** (Emphasis in original in both examples). These statements were still misleading – indeed, these statements were in earlier prospectuses (unbolded) in the risk section, but it demonstrates that the earlier discussions of risk were misleading. These statements were still misleading because they did not disclose that using the SDS Fund for anything else besides one day was almost mathematically certain to cause radical losses in a volatile market such as the underlying the SDS Fund.

**D. Statement by FINRA & Others**

60. In June 2009, FINRA issued Regulatory Notice 09-31, in which FINRA "remind[ed] firms of their sales practice obligations in connection with leveraged and inverse ETFs." In particular, FINRA admonished that sale materials related to leveraged and inverse ETFs "must be fair and accurate." FINRA further cautioned:

> **Suitability**
>
> NASD Rule 2310 requires that, before recommending the purchase, sale or exchange of security, a firm must have a reasonable basis for believing that the transaction is suitable for the customer to whom the recommendation is made. This analysis has two components. The first determining whether the product is

> suitable for any customer, an analysis that requires firms and associated persons to fully understand the products and transactions they recommend.
>
> **Communications With the Public**
>
> NASD Rule 2210 prohibits firms and registered representative from making false, exaggerated, unwarranted or misleading statements or claims in communications with the public.
>
> Therefore, all sales materials and oral presentations used by firm regarding leveraged and inverse ETFs must present a fair and balanced picture of both the risks and benefits of the funds, and may not omit any material fact or qualification that would cause such a communication to be misleading.

61. FINRA spokesman Herb Perone has stated: "Exotic ETFs, such as inverse, leveraged and inverse-leveraged ETFs, are extremely complicated and confusing products, and the marketing and sale of those products to unsophisticated retail and investors is very much on FINRA's radar screen."

62. FINRA issued additional guidance on July 13, 2009 by way of a podcast on its website. FINRA reiterated that most leveraged and inverse ETFs reset each day and are designed to achieve their stated objective on a daily basis–but with the effects of compounding over a longer time frame, results differ significantly. In spit of this admonishment, Defendant Sapir maintains that ProShares' leveraged and inverse ETFs can be used "for more than a day successfully."

63. On July 15, 2009, Massachusetts' Secretary of State William Galvin announced that Massachusetts had begun a probe into the sale practices of ProShares, among other firms heavily involved in structuring leveraged ETFs.

64. On July 21, 2009, as reported by the *Wall Street Journal* in an article entitled "Getting Personal, Edward Jones Drops ETFs," Edward Jones & Co. called ETFs like the SDS Fund "one of the most misunderstood and potentially dangerous types of ETFs."

65. On July 27, 2009, in a letter to wealth management clients, as reported by *The Wall Street Journal* in an article entitled "Strange Traded Funds," UBS said it would not trade ETFs that use leverage or sell any underlying asset short. Similarly, on the heels of the FINRA Notice, Ameriprise Financial and LPL Investment Holdings Inc. have also prohibited sales of leveraged ETFs seek more than twice the long and short performance on their target index.. Wells Fargo is now also reportedly reviewing its policy on non-traditional ETFs.

66. On July 30, 2009, the *Wall Street Journal* published an article entitled "Warning Signs Up for Leveraged ETFs," in which it was reported that Morgan Stanley Smith Barney is reviewing how it sells leveraged ETFs. The article also observed that Charles Schwab ("Schwab") issued an unusual warning on July 28 to clients who buy non-traditional ETFs. Schwab offered a strongly worded warning on its website noting that "while there may be limited occasions where a leveraged or inverse ETF may be useful for some types of investors, its is extremely important to understand that, for holding periods longer than a day, these funds may hot give you the returns you may be expecting …. Proceeds with extreme caution."

67. The statements in the Registration Statement are misleading and the risk disclosures do not come to this "[p]roceed with extreme caution" level of clarity.

68. On August 1, 2009, *The Wall Street Journal* quoted Morningstar's director of ETF analysis, Scott Burns, who observed: "Hedges [like the SDS Fund] aren't supposed to become less trustworthy when you really need them."

**CLAIM ONE**
**Violations of § 11 of the 1933 Act Against All Defendants**

69. This Count is brought pursuant to Section 11 of the 1033 Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.,

70. Plaintiff incorporates by reference the above paragraphs, as if set forth herein. This Claim is asserted against all defendants.

71. ProShares is the issuer of the shares sold via the Registration Statement. The Individual Defendants are signatories and/or authorizers of the Registration Statement.

72. Plaintiff and the Class all purchased shares of the SDS Fund issued pursuant and/or traceable to the Registration Statement.

73. Defendants are liable for the material misstatements in and omissions from the Registration Statement.

74. Plaintiff and other members of the Class purchased or otherwise acquired their SDS Fund shares without knowledge of the untruths or omissions alleged herein.

**CLAIM TWO**
**Violations of § 15 of the Securities Act Against the Individual Defendants**

75. Plaintiff incorporates by reference the above paragraphs, as if set forth herein. This Count is asserted against the Individual Defendants.

76. Each of the Individual Defendants named herein acted as a controlling person of the Company within the meaning of Section 15 of the Securities Act. The Individual Defendants were trustees, officers, and/or directors of ProShares charged with the legal responsibilities of overseeing its overseeing. Each controlling person had the power to influenced and exercised the same to cause the controlled person to engage in the unlawful acts and conduct complained of herein.

77. By reason of such conduct, the Defendants named in this Count are liable pursuant to Section 15 of the Securities Act. As a direct and proximate result of their wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the SDS Fund.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure.

B. Awarding damages in favor of Plaintiff and the other Class members against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in the action, including counsel fees and expert fees; and

D. Such equitable/injunctive or other relief as deemed appropriate by the Court.

Dated: November 6, 2009

Respectfully submitted,

**STULL, STULL & BRODY**

By: ______________________

Jules Brody (JB-9151)
Aaron Brody (AB-5850)
James E. Lahm (JL-0242)
6 East 45th Street
New York, New York 10017
Tel: (212) 687-7230
Fax: (212) 490-2022

**WEISS & LURIE**
Joseph H. Weiss (JW-4534)
551 Fifth Avenue
New York, New York 10176
Tel: (212) 682-3025
Fax: (212) 682-3010

***Attorneys for Plaintiffs***

## PLAINTIFF CERTIFICATION

I, Vahan Setyan, ("Plaintiff") hereby state that:

1. Plaintiff has reviewed the complaint and has authorized the filing of the complaint on his/her behalf.

2. Plaintiff did not purchase any shares of the ProShares UltraShort S&P 500 Fund (the "SDS Fund") offered by ProShares Trust ("ProShares" or the "Trust") at the direction of his/her counsel or in order to participate in this private action.

3. Plaintiff is willing to serve as a lead plaintiff and/or representative party on behalf of a class, including providing testimony at deposition and trial if necessary.

4. All of Plaintiff's purchases and/or sales of the SDS Fund which are the subject of the complaint are set forth below:

| TRADE DATE | SECURITY/SYMBOL | QUANTITY | PRICE PER SHARE | PURCHASE / SALE |
|---|---|---|---|---|
| 11/21/2008 | SDS | 5 | $132.46 | Purchase |
| 11/21/2008 | SDS | 5 | $127.74 | Sale |

5. Plaintiff has not served or sought to serve as a representative party on behalf of a class under the federal securities laws during the last three years unless otherwise stated in the space below:

The UYG Fund; the DUG Fund; the FXP Fund; the DIG Fund.

6. Plaintiff will not accept any payment for serving as a representative party on behalf of a class except to receive his pro rata share of any recovery, or as ordered or approved by the court including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

Plaintiff declares under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of November, 2009

Signature